**LYNCH CARPENTER, LLP**
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
1234 Camino del Mar
Del Mar, CA 92014
Tel:   619-762-1910
Fax:   858-313-1850

*Attorneys for Plaintiffs*
*and Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| D.B., R.L., and R.S., individually on behalf of themselves and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DBZ ENTERPRISES LLC, doing business as K-CHILL, and DOES 1-50, inclusive,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs D.B., R.L., and R.S.[1] (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant DBZ Enterprises LLC, an Arizona limited liability company doing business as "K-Chill" and "Kryptic Kratom" ("Defendant" or "K-Chill")[2] and Does 1 through 50, inclusive.

---

[1] Because this action concerns issues of addiction and medical status, Plaintiffs are filing under their initials for the sake of their personal privacy. Plaintiffs are reasonable consumers who fell victim to Defendant's omissions and misrepresentations about the addictive nature of kratom, which operates like an opioid, and became addicted as a result. Since addiction issues are still wrongly stigmatized, Plaintiffs are filing this matter anonymously but will reveal their names as necessary to the Court under seal.

[2] DBZ Enterprises LLC owns and operates both the K-Chill brand as well as Kryptic Kratom. Each brand has its own separate website. *See* https://www.k-chill.com/; http://kryptickratom.com/. However, Kryptic extract shots and capsules are sold on the K-Chill website. *See* https://www.k-chill.com/product-category/drinks/. K-Chill sells raw kratom powder, powder capsules, extract shots, and extract capsules. Kryptic only appears to sell extract shots and capsules. On information and belief, the K-Chill and Kryptic extract shots and capsules have approximately the same amount of kratom extract in them and can otherwise be treated as largely interchangeable.

## NATURE OF THE ACTION

1.      This is a civil class action against Defendant for false, misleading, deceptive, and negligent sales practices regarding its kratom powder, capsule, and liquid extract products (collectively, the "Products"). Kratom is both a plant and a drug. Mitragynine ("MG") is an alkaloid (psychoactive chemical) found in the kratom plant (*mitragyna speciosa*).  The plant originates from Southeast Asia where its leaves have long been ingested to produce stimulant and opiate-like effects.  Use of kratom in the United States was practically non-existent until the last decade. Since then, kratom has become a massively popular substance in the United States. This is because it is currently legal to consume, and because of the stimulant and opiate-like effects produced by its major alkaloid: MG.

2.      However, what consumers do not know is that the opiate-like effects produced by MG are not the result of novel chemical interactions in the brain.  Rather, this alkaloid is behaving, in part, exactly like opioids.  That is, the MG found in the kratom plant activates the same opioid receptors in the human brain as morphine, heroin, and other opiates.  Consequently, kratom consumption has the same risks of addiction, dependency, and painful withdrawal symptoms, among various other negative side effects.

3.      The general public is largely unaware of kratom and its addictive potential. When reasonable consumers think of opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, or morphine; they do not think of the K-Chill and Kryptic Kratom Products or expect the "botanical extract" kratom product sold at their local gas stations or corner stores to act like an opioid, or have the same addiction and dependency risks as opioids. Kratom is extremely addictive, and as a result, tens of thousands of unsuspecting consumers have developed kratom dependencies that cause them serious physical, psychological, and financial harm.

4.      Defendant has intentionally failed to disclose these material facts regarding the dangers of kratom consumption anywhere on its Products' labeling, packaging, or

marketing material. As a result, Defendant has violated warranty law and state consumer protection laws.

5. Defendant relies on its Products' vague packaging and consumers' limited knowledge of kratom pharmacology to get unsuspecting users addicted to its Products and reaps substantial profits from these addictions. Defendant relies on this ignorance and does nothing to correct it. Such activity is outrageous and is contrary to California law and public policy.

6. Plaintiffs seek relief in their action individually, and as a class action, on behalf of similarly situated purchasers of Defendant's Products, for the following violations of: (i) California's Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq.* (the "UCL"); (ii) California's Consumer Legal Remedies Act, Civ. Code § 1750, *et seq.* (the "CLRA"); (iii) California's False Advertising Law, Bus. & Prof. Code § 17500, *et seq.* (the "FAL"); (iv) Oregon's Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq.* (the "UTPA"); (v) breach of implied warranty; (vi) unjust enrichment; and (vii) fraud by omission.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this case is a class action where the aggregate claims of all members of the proposed Classes (defined below), exclusive of interest and costs, exceed the sum or value of $5,000,000 and Plaintiffs, and at least some members of the proposed Classes, have a different state citizenship from Defendant.

8. This Court has personal jurisdiction over Defendant because Defendant is an entity with constitutionally sufficient contacts with this District to make personal jurisdiction in this Court proper. Defendant conducts sufficient business with sufficient minimum contacts in this District, and otherwise intentionally avails itself to this District's market through its operations and sales within the State of California and this District. This

Court may exercise supplemental, or pendent, jurisdiction over Plaintiff R.S. and the claims of the Oregon Class pursuant to 28 U.S.C. § 1367.[3]

9.    Venue is proper in this District because Defendant transacts substantial business in the District, and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claim arose in this District, in part, because Plaintiff D.B. resides in and made relevant purchases in this District.

## GENERAL ALLEGATIONS

### A.    Background and Pharmacology of Kratom

10.    "Kratom" refers to the substance derived from the leaves of a tropical plant, *mitragyna speciosa*, (the "kratom plant"), indigenous to Southeast Asia, where it has been used in herbal medicine since the 19th Century. Kratom's first reported use in scientific literature was in 1836, when it was noted that Malays used kratom tree leaves as a substitute for opium. Historic use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia, where kratom remains popular to this day.

11.    Kratom is the most widely used drug in Thailand. This popularity does not mean Thailand believes kratom is harmless. To the contrary, Thailand understands that

---

[3] The doctrine of pendent personal jurisdiction permits a district court to exercise personal jurisdiction over "a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004). *See id.* at 1181 ("[w]hen a defendant must appear in a forum to defend against one claim, it is often reasonable to compel that defendant to answer other claims in the same suit arising out of a common nucleus of operative facts."); *CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 1107, 1113 (9th Cir. 2004) ("Whether to exercise pendent personal jurisdiction is committed to the sound discretion of the district court."); *Allen v. ConAgra Foods, Inc.*, No. 3:13-CV-01279-WHO, 2018 WL 6460451, at *7–8 (N.D. Cal. Dec. 10, 2018), *on reconsideration*, No. 3:13-CV-01279-WHO, 2019 WL 5191009 (N.D. Cal. Oct. 15, 2019) (court's exercise of pendent personal jurisdiction over out-of-state plaintiff and class members' state law claims were based on same nucleus of operative facts as in-state plaintiff's claims and there would be "*de minimis* burden on the defendant, who would otherwise face piecemeal litigation."); *Allen v. Similasan Corp.*, No. 12CV0376-BTM-WMC, 2013 WL 2120825, at *3 (S.D. Cal. May 14, 2013) (pendent personal jurisdiction over non-resident plaintiff's claims was appropriate because his "claims arise out of the same common nucleus of operative fact as [the in-state plaintiff's] claims, for which the Court does have jurisdiction over the defendant [and] [t]here is no prejudice to [defendant] in hearing both cases together.").

kratom is dangerous, as demonstrated by Thailand's ban of kratom in 1943.[4] Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

12.   Kratom's unknown and inconsistent effects have historically been part of its appeal. For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect during hard day-labor by chewing fresh kratom leaves, and also for an analgesic or relaxing effect by brewing kratom into a tea.

13.   In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments (e.g., pain, mental health, opioid withdrawal symptoms), and/or to obtain a "legal" or "natural" high.

14.   To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[5]

15.   The chemicals in the kratom plant which produce a psychoactive effect when ingested are called "alkaloids." Alkaloids are a class of various naturally occurring organic chemical compounds. The primary alkaloid in kratom leaves responsible for the kratom's effects is MG.

16.   MG produces a wide spectrum of effects because it interacts with many different receptors in the brain. Studies show that MG interacts with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

---

[4] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together. However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

[5] When kratom leaves are extracted into a liquid formulation, this is colloquially called a "kratom shot."

17.     Most crucially, MG also interacts with the mu-opioid receptor,[6] and MG was found to be more potent to the mu-opioid receptor than morphine when taken via oral administration.

18.     Accordingly, kratom products are referred to as a "quasi-opiate" by health professionals because of its opioid-like characteristics.

19.     Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms which users feel compelled to avoid by taking more of the drug. The tragedy of addiction is that users want to stop but cannot.

20.     All substances that act on the opioid receptors have a high risk of addiction, and kratom is no exception. Addiction occurs when an opioid is ingested on a regular basis and, over time, the user develops a tolerance to the drug that requires the user to consumer an increased dose of the drug to achieve the same effects a lower dose previously had. As these doses increase, the body becomes dependent on the drug to feel normal and function properly. When the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs. Withdrawal symptoms cause the user to feel much worse than they did before they started taking the drug and can be extremely painful and intolerable to the user.

21.     Indeed, kratom withdrawal symptoms are very similar to those of traditional opioid withdrawal. Such symptoms include irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

22.     Users typically start substances like kratom because of how good it makes them feel, but once addicted, they use kratom to avoid the pain and sickness of withdrawal. Use is no longer is about getting high, but about not feeling "sick."

---

[6] The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia. For this reason, the mu-opioid receptor is known as "the gateway to addiction" because it is the receptor which all opioids interact with to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

**B.    Kratom Use and Addiction in the United States**

23.    Over the past decade, kratom has exploded in popularity within the United States. As of 2021, the American Kratom Association estimates that kratom is a $1.3 billion a year industry, with 11 million to 15 million annual users within the United States. Studies show that 1 million United States residents use kratom monthly, and that two-thirds of those users use kratom daily.

24.    Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers and so it appeals to consumers who falsely equate "natural" with "safe;" second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

25.    Kratom is still a relatively unknown substance to the average consumer, and most people have never heard of it.

26.    Kratom sellers advertise it is a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day. Some even assure consumers that kratom is a <u>non-addictive</u> way to deal with opioid withdrawal. These kratom companies universally reiterate these purported "benefits" of kratom consumption, without disclosing any of the corresponding harms of kratom use.

27.    As a result of kratom manufacturers', retailers', and advertisers' failure to warn consumers of kratom's addictive potential, many kratom users find themselves blindsided when they stop taking kratom and find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement. Further, because kratom is relatively unknown in the United States, there are not well-established recovery resources for addicted users to turn to for resources and aid. Some kratom users turn to the Internet for support, and there are well-populated and very active

Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

28.    The reports from addicted kratom users are heart-wrenching. Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to kratom, and how difficult it was to stop their kratom use. Below are several accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 45,000 members as of October 2024:[7]

   **i.**    In one post titled **K chill**, a user wrote:

I've been lurking for quite some time. My last dose was today about 2 hours ago and have been using for 1 year. I have a past of OxyContin, opana, and finally suboxone so I am familiar with dope sick. My reason for posting is this...has anyone's main use been those gas station drinks called k chill? I'm ashamed to admit I take 3-7 daily. Is this going to be easier or more difficult to quit the leaf or the extract? Thank you for listening and wish me luck!!

   **ii.**    In a separate post titled **Kratom & Creed**, another user wrote:

Anyone else been listening to Creed at an excessive level to help get through their K struggles? Man I haven't listened to them since jr. high and I just feel like My Own Prison and One Last Breath capture how I've been feeling the last few years. Anybody else?? No? Ok then. I hate that Circle K sells K-Chill and Feel Free. I went in today to grab a redbull or something and that evil K was calling my name. I was so close to buying it. I know 2 weeks clean isn't much but man I was thinking of every justification to just indulge and "reward myself" for making it this long. I'm glad I didn't relapse. What do you all do to stay the course?

---

[7] *See* https://www.reddit.com/r/quittingkratom.

CLASS ACTION COMPLAINT

**a.    Another user responded:**

That's a HUGE battle you won! Be proud of yourself! I won't go into a store that sells it right now, zero desire to see that shit EVER again day 7 here for me today!

**b.    Another user responded:**

Good luck and trust me it's not worth it to even take one shot, it always leads to a binge and withdrawals. I quit for 7 months and relapsed for about a week and a half. If you can make it 2 weeks I'd recommend vivitrol I had my longest clean time with it. Figure out your triggers too, mine is shit sleep and getting overwhelmed with work.

**c.    Another user responded:**

Just avoid those stores. Saw it today as well in the plastic case. This CT has been a rough three weeks. Finally went to bed comfortable last night and actually woke up feeling "normal" able to sit without that light muscle discomfort and had moments of just being content while driving this morning. First day since my CT started. Granted I've been feeling better but not myself. Even if I get a few hours of this today it's still better than the 20 minutes I'd feel good from caving. Think about that. You may feel good for 20 minutes today and you're already winning against K. Shit, Even if you don't, you've won.

**iii.    In a separate post titled About to complete 4 days clean**, another user wrote:

I am about to be 4 full days clean of kratom(Feel Free and K-chill capsules). I've been on and off it since 2020. This last year was this worst as I used almost every day. It hasn't been easy but this feels like such an accomplishment. I'm glad I found this page and know that I am not alone.

29.    Other experiences with kratom (not necessarily K-Chill Products) described on the subreddit are similarly horrifying:

       **i.**      **One user wrote:**

I started using kratom in pill and powder form a couple years ago. <u>I had no idea</u> it was addictive, and I liked how it made me feel.... so much that I went from using it a couple weekends a month to wanting to use it every weekend to wanting to use it every day. I upped my dose a whole bunch, and soon I started to realize that, when I didn't take it, I would start to get what seemed like withdrawals! WTF? I googled it and did some more research and learned that I was indeed going through withdrawals. I immediately decided to suck it up and get off that stuff and spend a week withdrawing. Unfortunately, it wasn't that simple. I was addicted. That poison was in my mind constantly. I started using again and, LONG story short and many MANY other withdrawal attempts later, I had lost my JOB, my boyfriend, and my personality. It landed me in the hospital many times actually. I was losing hair, my eyes looked horrible, my skin was horribly dry, and I was miserable. I decided to go to REHAB. Effing rehab for this sh!t.

       **ii.**      **Another user shared:**

I just tapered down from 80gpd to 20, and the experience was so awful that I just decided to jump yesterday, figuring "Let's just get this over with already!" Well, I gotta tell you, last night may have been one of the roughest nights of my life. It felt like a bad acid trip. I got zero sleep. The RLS was so bad I kept getting out of bed, bundling up, which was exhausting in itself, and going for a loop around the property outside; while hoping to be able to crawl back in bed and actually sleep. Nope. It felt like I was being electrocuted!!! This is even with clonidine and gabapentin. But, I'm determined to NEVER go through that first night again! (And of course I was lamenting my rash decision to jump, and DYING to take some K). But, there's no turning back now. I'm hoping I'll get some sleep tonight since I had none last night. Wish me luck please :).

**iii.      Another user shared:**

I was the worst kratom addict I knew and now I'm coming up on 5 months sober. Let me first qualify VERY quickly…  Multiple extract shots a day, crying on the way to the store, cut up all my credit cards multiple times (until I got Apple Pay), sent my credit cards to myself in the mail, got on oral naltrexone, got on vivitrol (the injectable shot), gave my wife my wallet, lied every day, ... Today I'm sober off of everything and almost 5 months clean. I don't crave alcohol or drugs anymore. Cravings were my biggest problem. I don't think about kratom all day any longer. I had to walk my sad @$$ all the way to a 12 step program in order to get help. I have to talk to other struggling people. I had to start working a program of recovery which i still work…My habit was $50 a day, and with a newborn and mortgage etc I'm still trying to climb out of that hole. But man, to go from complete self-hate to self-love makes everything worth it. I hated myself, not anymore.

30.    This Internet forum is filled with other accounts like these, and the stories are consistently the same—well-meaning people were looking to feel better by taking with what they thought was an "herbal supplement," only to develop an opioid-like addiction. This anecdotal evidence makes clear that kratom's addictive potential is a material fact to reasonable consumers that, if known, would help inform their purchase and consumption decisions. However, Defendant's Products have no information whatsoever warning that kratom is similar to an opioid, is habit-forming, or that regular use will result in opioid-like dependency and withdrawal symptoms.

31.    Consumers who knew the truth about kratom may not have purchased Defendant's Products or would have paid less than they did for them.

**C.    Defendant Knew or Should Have Known it was Selling a Highly Addictive Drug to Unsuspecting Consumers**

32.    Despite kratom's traditional medical uses, the negative effects of kratom use have long been known and observed, and are well-documented in Southeast Asia where

the plant originates and has a long period of historic use. Kratom addiction in Thailand and Malaysia has been studied and documented in the United States by scientists and researchers since at least 1988.

33.    Upon information and belief, Defendant has interacted with growers and distributors in Southeast Asia who have disclosed the addictive nature of kratom to it.

34.    Even without such interactions, Defendant received numerous user reports about the addictive potential of kratom in the United States.

35.    Defendant therefore knew or should have known that the Products it was selling were highly addictive.

36.    Despite this knowledge, Defendant failed to disclose kratom's addictive potential to its customers on its Products' packaging.

37.    Defendant has no excuse for its lack of a detailed disclaimer warning on its Products packaging of kratom's harms. The pharmacological effects of MG have been thoroughly studied, and it is well-established that MG acts on the same mu-opioid receptors in the brain as traditional opioids do. Further, there are widespread reports and studies of other addiction and dependency issues.

38.    Defendant therefore knows or should have known that kratom users can develop an addiction. Yet, Defendant fails to disclose this material fact on its advertisements or on its Products' packaging.

39.    Defendant markets its K-Chill Products as if they are nothing more than over-the-counter supplements. Indeed, the packaging looks more like allergy medication than a dangerously strong opioid, and Defendant's glossy website and design language obfuscates the very real truth that it is selling a strong narcotic to consumers who likely do not fully comprehend the risks associated with consuming the Products.

40.    Like Plaintiffs' experiences described below, consumers may walk into the local headshop and see Defendant's Product and be enticed into purchasing it because they think it looks inviting and, if it was dangerous, there would be a warning on the package.

CLASS ACTION COMPLAINT

41.    Reasonable consumers looking at the Products' packaging and online store description would not presume that kratom is highly addictive.

42.    Nowhere on the packaging does Defendant mention that kratom presents the same addiction problems that former opioid users and any other consumers would want to avoid.  Consumers seeking help as they come off opioids may be drawn in by Defendant's misleading statements about kratom without knowing that they risk trading one addiction for another.

43.    As a kratom product seller, manufacturer and/or distributor, Defendant occupies a position of superior knowledge to the average reasonable consumer, who likely knows nothing about kratom.

44.    The information provided on Defendant's Products' packaging in particular is woefully sparse. Representative images of Defendant's K-Chill and Kryptic Kratom Products are depicted below:



CLASS ACTION COMPLAINT



45.     On Defendant's websites where it sells these Product, Defendant does not provide any image of the back of the Product's bottle or show any ingredient list on the bottle or on the Product's webpage.[8]

46.     Defendant does not provide any warning to consumers on its Products' packaging or webpage where it sells its Products that its Products interact with opioid receptors or are highly addictive and should not be taken on a daily basis, or note any of the numerous negative side effects and withdrawal symptoms caused by its Products.

47.     Indeed, the entire contents of the warning on the Product's webpage is a bog-standard disclaimer that consumers should not take the Products with alcohol, if they are pregnant, breastfeeding, or operating heavy machinery or a motor vehicle, and that Defendant is not liable for "misuse of any botanical product."

48.     A boilerplate disclaimer is plainly insufficient. This is a Product that poses a serious risk of intense addiction and withdrawal in line with traditional "hard" opioids.

---

[8] *See* https://www.k-chill.com/shop/k-chill-red-hush-70ct-pills/ and http://kryptickratom.com/.

49.     Addiction is a disease.  As such Defendant's Products pose an unreasonable health hazard, and Defendant had and has a duty to disclose this fact on its Products' packaging.

50.     What's more, nothing about the Products' packaging would lead reasonable consumers to believe they were purchasing compounds similar to opioids, that function on the same mu-opioid receptors in the brain.  It looks as innocuous as a vitamin supplement.

51.     Defendant, through its misleading advertising and its failure to disclose kratom's addictive properties on its Products' labels, relied upon the average consumer's incomplete knowledge of kratom to better sell its Products and get users addicted to them.

52.     Defendant fails to disclose kratom's addictive potential because Defendant knows that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions, likely to Defendant's financial detriment.

53.     By any metric, Defendant's conduct is immoral, unethical, and contrary to public policy.

54.     The United States is going through an opiate crisis that is shaking the foundations of our society. Amid this crisis, Defendant is creating more addicts for no reason other than to line its pockets, without adequate disclosure of its Products' risks through the use of false and misleading packaging and marketing. That cannot–and should not–be allowed, at least when Defendant's conduct entails breaches of warranty and violation of state consumer protection statutes as it does here.

## **PARTIES**

55.     Plaintiff D.B. resides in and is a citizen of Garden Grove, California. D.B. first learned about kratom when he saw it advertised in stores as providing pain relief, bursts of energy, and an ability to work for hours. When D.B. first saw K-Chill, it was advertised to him as safe, all natural, and made from a leaf, so he believed it was similar to tea. When D.B. inspected the K-Chill Products, D.B. saw no warnings on the Products packaging of any potential negative side effects. D.B. first started purchasing the K-Chill Products in or around two years ago. Thereafter, D.B. would purchase K-Chill Products

whenever he saw them on the shelf at many different smoke shops in Huntington Beach and San Diego, California. After about three months of consuming Defendant's Products, negative side effects started to occur and D.B. realized he was addicted to Defendant's Products. The withdrawal symptoms D.B. experienced when he tried to quit or cease taking the Products included flu-like symptoms, sweats, and constipation (at certain times causing him to go 2-7 days without a bowel movement). To avoid these withdrawal symptoms, D.B. began consuming more of the K-Chill Products, but this in turn led him to other issues. D.B. had started taking so much that four hours after consuming K-Chill, he would throw it up and suffer from severe digestive issues. D.B. was damned either way: he suffered debilitating stomach issues on and off the Products.

56.     During this time, D.B. was consuming at least one entire $20 bag of K-Chill powder each day. Oftentimes, however, D.B. would have to purchase another K-Chill bag before the end of the day. D.B. only finally quit kratom by submitting himself into an in-patient treatment program in California and by taking Suboxone. While D.B. considers this current life stage to be far more positive than when he was taking kratom, it still negatively impacts him because a friend of his that he used to take kratom with is still suffering from addiction to the Products and is unlikely to be able to quit. Had D.B. known that Defendant's Product was highly addictive, by way of a warning on the Product's packaging, he never would have purchased it.

57.     Plaintiff R.L. resides in and is a citizen of Twentynine Palms, California. R.L. first heard about kratom in or around 2010 when she worked at a smoke shop that sold it, long before she ever tried kratom. Though R.L. was born and raised in California, she briefly lived in Idaho for approximately two years, from August 2021 to mid-2023. It was during this time, in 2021, that R.L. first tried K-Chill Products. R.L. decided to try K-Chill because she believed it could help her with her sciatica, back issues and pain, and that it was a healthier alternative to opiates, which she had had problems with in the past. R.L. first purchased K-Chill from Vape, a corner store in Berley, Idaho. At the time, R.L. observed that the only warning on the K-Chill packaging was to not take it if pregnant or

breastfeeding and not to operate machinery; there was no warning about dependency, addiction, or withdrawals. When R.L. moved back to California in or around July 2023, she continued to use K-Chill unaware of any physical dependency issues; she purchased it generally from smoke shops in and around the greater Twentynine Palms area.

58.     About one year ago, R.L.'s addiction to K-Chill was at its worst. She was using three to four $3.99 twelve packs of K-Chill Product daily, in total consuming 48 kratom 500 mg capsules daily—approximately 24 grams per day. Around this time, R.L. attempted to stop taking the Products. This cessation of use triggered severe withdrawal symptoms, including hot and cold sweats, shakes, nausea, vomiting, and restless legs that led to severe insomnia. In her desperation, R.L. joined an online kratom addiction support group that turned out to be very helpful in her efforts to quit. In her view, at that time, kratom had ruined her relationship and her life, generally. Amazingly, with the help of her support group, in or around late-September and early-October 2024, R.L. was able to successfully quit Defendant's Products and kratom in general. In her own words, the withdrawals were "God awful" and she "thought she was going to die" from them. However, R.L. is now about a month kratom free and very proud to have gotten this far. She feels better now than she has in a long time and she hopes to spread awareness with this action and to help others who have been similarly victimized to get their money back. Had R.L. known that Defendant's Product was highly addictive, by way of a warning on the Product's packaging, she never would have purchased it.

59.     Plaintiff R.S. resides in and is a citizen of Sheridan, Oregon. R.S. first learned about K-Chill when he saw it in several smoke shops and looked it up online and read that it could help with the arthritic-like joint pain he suffered from. Around 2018-2019, R.S. first purchased K-Chill from a store called Get and Go Grocery in Oregon City, Oregon. When R.S. purchased K-Chill, he did not see any risks listed on the K-Chill Products' packaging. Very soon after R.S. first purchased K-Chill, he realized there was a problem when he felt withdrawal symptoms after only a day of nonuse. When R.S. later tried to quit, he suffered from body tremors, sweats, shaky arms, and restless/shaky legs. By late-

2023, R.S. had a hernia and started consuming even more K-Chill to help with related pain until he had surgery in early-2024. At the height of his addiction, R.S. was consuming at least three K-Chill extract shots per day, with each bottle costing somewhere from $6.00 to $20.00. Over the past several months, R.S. was finally able to quit K-Chill by very slowly weaning off of it. Had R.S. known that Defendant's Product was highly addictive, by way of a warning on the Product's packaging, he never would have purchased it.

60.    Defendant DBZ Enterprises LLC, doing business as K-Chill and Kryptic Kratom, is an Arizona limited liability company with its principal place of business in Chandler, Arizona. Defendant owns and operates the K-Chill website, https://www.k-chill.com, and also advertises, markets, distributes, and sells its K-Chill Products in California, Oregon, and throughout the United States.

61.    Plaintiffs do not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sue such defendants by such fictitious names. Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Doe defendants is, in some manner, legally responsible for the damages suffered by Plaintiffs and members of the proposed Classes as alleged herein. Plaintiffs reserve the right to amend this Complaint to set forth the true names and capacities of these defendants when they are ascertained, along with appropriate charging allegations, as may be necessary.

## **CLASS ALLEGATIONS**

62.    Plaintiffs bring this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all other Class members, defined as follows:

> All persons nationwide who, within the applicable statute of limitations period, purchased K-Chill and Kryptic Kratom branded kratom Products (the "Nationwide Class").

All persons who, within the applicable statute of limitations period, purchased K-Chill and Kryptic Kratom branded kratom Products while in California (the "California Class").

All persons who, within the applicable statute of limitations period, purchased K-Chill and Kryptic Kratom branded kratom Products while in Oregon (the "Oregon Class").

63.     Excluded from the Classes are Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action. Plaintiffs reserve the right to expand, limit, modify, or amend these Class definitions, including the addition of one or more subclasses, in connection with their motion for Class certification, or at any other time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

64.     ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe that the proposed Classes contain at least thousands of consumers throughout California, Oregon, and the United States who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs at this time.

65.     ***Existence and Predominance of Common Questions of Law and Fact***:  This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

a.     whether the labels on Defendant's Products have the capacity to mislead reasonable consumers;

b.     whether Defendant knew that kratom is a highly addictive substance that causes physical and psychological dependence and opioid-like withdrawal symptoms;

c.    whether Defendant's conduct alleged herein violated the FAL, CLRA, UCL, and/or UTPA;

d.    whether Defendant's conduct alleged herein constitutes unjust enrichment;

e.    whether Defendant's conduct constitutes a fraudulent omission;

f.    whether Plaintiffs and the Classes are entitled to damages and/or restitution; and

g.    whether an injunction is necessary to prevent Defendant from continuing to sell its K-Chill and Kryptic Kratom Products without warning labels of their addictiveness.

66.    *Typicality*: Plaintiffs' claims are typical of the claims of the Classes in that Plaintiffs and the Class members sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to inform Plaintiffs and all others similarly situated that its Products are highly addictive and akin to opioids.

67.    *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the members of the Classes.  Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no antagonistic or adverse interests to those of the Classes.

68.    *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

69.    Defendant has acted or failed to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes as a whole.

70.     Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiffs and members of the Classes, and the general public—who are also negatively impacted by the dregs of addiction—and will likely retain the benefits of Defendant's wrongdoing.

71.     Based on the forgoing allegations, Plaintiffs' claims for relief include those set forth below.

72.     Plaintiffs are informed that Defendant keeps extensive computerized records through its online sales data, as well as through, *inter alia*, general marketing programs. Defendant has one or more databases through which a significant majority of the members of the Classes may be identified and ascertained, and Defendant maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

**FIRST CAUSE OF ACTION**
**Violation of California's Unfair Competition Law ("UCL")**
**Bus. & Prof. Code, § 17200, *et seq.***
***(On behalf of Plaintiffs D.B. and R.L. and the California Class)***

73.     Plaintiffs D.B. and R.L. re-allege and incorporate by reference every allegation set forth in the preceding paragraphs.

74.     Plaintiffs D.B. and R.L. bring this cause of action individually and on behalf of the members of the proposed California Class against Defendant.

75.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent, business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]" A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Such a person may bring such an action on behalf of himself or herself and other similarly situated who are affected by unlawful and/or unfair business practices or acts.

76.     As alleged below, Defendant has committed unlawful, fraudulent, and/or unfair business practices under the UCL by (a) representing that its K-Chill and Kryptic Kratom Products have certain characteristics that they do not, in violation of Cal. Civ. Code § 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civ. Code § 1770(a)(9); (c) selling addictive substances to unsuspecting consumers and profiting from their addiction; and (d) failing to disclose that its K-Chill Kryptic Kratom Products pose a serious risk of addiction.

77.     Defendant's conduct has the capacity to mislead a significant portion of the general consuming public and to target consumers, acting reasonably in the circumstances.

78.     Defendant's conduct has injured Plaintiffs D.B. and R.L. and the California Class they seek to represent in that they paid money for a Product that they would not have purchased, or paid more than they would have, but for Defendant's failure to disclose the addictive nature of its K-Chill and Kryptic Kratom Products. Such injury is substantial and is not outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's labels, and thus also Defendant's omissions, consumers themselves could not have reasonably avoided such injury.

79.     Moreover, Defendant's Products pose an unreasonable health hazard because kratom is highly addictive and may induce serious withdrawal symptoms.  Accordingly, Defendant had a duty to consumers to disclose on the Products' labels that its K-Chill and Kryptic Kratom Products pose a risk of physical and psychological dependence.

80.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs D.B. and R.L. and the California Class members seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiffs D.B. and R.L. and the other California Class members; (b) disgorge all revenues obtained as a result of Defendant's violations of the UCL; and (c) pay Plaintiffs D.B. and R.L. and the California Class members' attorneys' fees and costs.

81. Here, equitable relief is appropriate because Plaintiffs D.B. and R.L. may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Products is determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiffs D.B. and R.L. would be left without the parity in purchasing power to which they are entitled.

**SECOND CAUSE OF ACTION**
**Violation of California's False Advertising Law ("FAL")**
**Bus. & Prof. Code, § 17500, *et seq.***
**(*On behalf of Plaintiffs D.B. and R.L. and the California Class*)**

82. Plaintiffs D.B. and R.L. reallege and reincorporate by reference all paragraphs alleged above.

83. Plaintiffs D.B. and R.L. bring this claim individually and on behalf of the California Class against Defendant.

84. Defendant's acts and practices, as described herein, have deceived, and are likely to continue to deceive, California Class members and the public at large. As described above and throughout this Complaint, Defendant failed to disclose that kratom is addictive on its Products' packaging.

85. Defendant disseminated uniform advertising regarding its kratom Products to and across California. This advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of the FAL. Such advertisements were intended to, and likely did, deceive the consuming public for the reasons detailed herein.

86. The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive because Defendant continues to misrepresent that kratom is not addictive.

87. Defendant knew, or should have known, that in making and disseminating these statements, its advertisements were untrue and misleading in violation of California law. Defendant knows that kratom is addictive yet fails to disclose this fact to consumers.

88.    Plaintiffs D.B. and R.L. and the California Class members purchased Defendant's Products based on Defendant's misrepresentations and omissions indicating that kratom is not addictive.

89.    Defendant's misrepresentations and non-disclosures of the material facts described herein constitute false and misleading advertising and, therefore, constitute a violation of the FAL.

90.    As a result of Defendant's wrongful conduct, Plaintiffs D.B. and R.L. and California Class members lost money in an amount to be proven at trial. Plaintiffs D.B. and R.L. and the California Class are therefore entitled to restitution as appropriate for this cause of action.

91.    Plaintiffs D.B. and R.L. and the California Class seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorney's fees and costs under Cal. Civ. Proc. Code § 1021.5; and other appropriate equitable relief.

### THIRD CAUSE OF ACTION
**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**Civ. Code, § 1750, *et seq.***
***(On behalf of Plaintiffs D.B. and R.L. and the California Class)***

92.    Plaintiffs D.B. and R.L. reallege and reincorporate by reference all paragraphs alleged above.

93.    Plaintiffs D.B. and R.L. bring this claim individually and on behalf of the California Class against Defendant.

94.    Plaintiffs D.B. and R.L. and California Class members are consumers within the meaning of Civ. Code § 1761(d) of the CLRA.

95.    Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which she or he does not have."

96.    Civ. Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

97.    Civ. Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

98.    Defendant violated Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9) by failing to disclose that its kratom Products are addictive, an unreasonable health hazard and necessarily a fact which is material to reasonable consumers.

99.    Defendant's misrepresentations and omissions deceived, and have a tendency and ability to deceive, the general public.

100.    Defendant has exclusive or superior knowledge of kratom's addictive nature, which was not known to Plaintiffs D.B. and R.L. or California Class members.

101.    Plaintiffs D.B. and R.L. and California Class members have suffered harm as a result of these violations of the CLRA, Civ. Code § 1750, because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid had they known that kratom is addictive and causes withdrawals. As a result, Plaintiffs D.B. and R.L. and the California Class are entitled to actual damages in an amount to be proven at trial, reasonable attorney's fees and costs, declaratory relief, and punitive damages.

102.    On November 4, 2024, Plaintiffs' counsel sent Defendant a CLRA notice letter, which complies in all respect with § 1782(a). The letter was sent via certified mail, return receipt requested, and advised Defendant that it was in violation of the CLRA and demanded Defendant cease and desist from such violations and make full restitution by refunding the monies received therefrom. The CLRA letter stated that it was sent on behalf of all other similarly situated purchasers.

/ / /

/ / /

**FOURTH CAUSE OF ACTION**
**Violation of Oregon's Unlawful Trade Practices Act ("UTPA")**
**Or. Rev. Stat. § 646.605 *et seq.***
**(*On behalf of Plaintiff R.S. and the Oregon Class*)**

103.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs.

104.    Plaintiff R.S. brings this claim individually and on behalf of the members of the proposed Oregon Class against Defendant for violations of the UTPA, Or. Rev. Stat. § 646.605, *et seq.*

105.    The UTPA is intended to be interpreted liberally to protect consumers, covering a broad spectrum of unfair or deceptive practices in trade or commerce.

106.    The unlawful methods, acts and practices pled herein were committed in the course Defendant's business.  Or. Rev. Stat. § 646.608(1).

107.    Defendant is a "person," as defined by Or. Rev. Stat. § 646.605(4).  Defendant is engaged in "trade" and "commerce" in Oregon by advertising, offering or distributing for sale goods that directly or indirectly affect the people of the State of Oregon, as defined by Or. Rev. Stat. § 646.605(8).

108.    Defendant's kratom Products are "goods" that Plaintiff R.S. and the proposed Oregon Class obtained primarily for personal purposes, as defined by Or. Rev. Stat. § 646.605(6).

109.    Or. Rev. Stat. § 646.608(1)(e) states that it is an unlawful business practice for a company to represent that their goods sold have characteristics, ingredients, uses, or benefits that they do not have.  This provision is specifically intended to prevent economic harm based on deceptive commercial practices and extends to omissions.

110.    A "representation" under Or. Rev. Stat. § 646.608(1) is any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact.

111.    The Supreme Court of Oregon has clarified that for a defendant to violate the UTPA provisions prohibiting misrepresentations about a product's attributes, it is not required that the misrepresentations be material to consumer purchasing decisions.  *See*

*State ex rel Rosenblum v. Living Essentials, LLC*, 371 Or. 23 (2023).  This means that any misrepresentation about the product, regardless of its influence on the purchasing decision, can be actionable under the UTPA.

112.  Defendant has further engaged in "unconscionable tactics" by knowingly taking advantage of consumers' physical infirmity and ignorance, and knowingly permitting customers to enter into transactions in which the customers will derive no material benefit.  Or. Rev. Stat. § 646.605(9).

113.  Defendant's unlawful omissions, acts, and practices pled herein were "willful violations" of Or. Rev. Stat. § 646.608 because Defendant knew or should have known that Defendant's conduct was a violation, as defined by Or. Rev. Stat. § 646.605(10).

114.  Defendant's methods, acts and practices, including Defendant's representations, omissions, active concealments and failures to disclose, violated and continue to violate the UTPA.

115.  With respect to omissions, Defendant at all relevant times had a duty to disclose the information in question because (i) Defendant had exclusive knowledge of material information that was not known to Plaintiff R.S. and the Oregon Class (i.e., that kratom is highly addictive); (ii) Defendant concealed material information from Plaintiff R.S. and the Oregon Class; and/or (iii) Defendant made partial representations which were false and misleading absent the omitted information.

116.  Defendant's misrepresentations and nondisclosures deceive and tend to deceive a reasonable consumer and the general public.

117.  Defendant engaged in this reckless or knowing use of these unlawful methods, acts or practices alleged herein which have been declared unlawful by the UTPA.

118.  As a direct, substantial and/or proximate result of Defendant's conduct, Plaintiff R.S. and the Oregon Class members suffered compensable and ascertainable losses.

119.   Plaintiff R.S. and the Oregon Class members would not have purchased the Products at the prices they paid if they had known the harmful opioid-like effects of kratom consumption and/or its addiction and withdrawal symptoms.

120.   Plaintiff R.S. seeks on behalf of himself and the Oregon Class: (1) the greater of statutory damages of $200 or actual damages for every violation of the act; (2) punitive damages; (3) appropriate equitable relief, including injunctive and restitution, as appropriate; and (4) attorneys' fees and costs pursuant to Or. Rev. Stat. § 646.638, *et seq.*

121.   Under the UTPA, a private plaintiff may seek an injunction as may be necessary to ensure cessation of unlawful business and trade practices. Or. Rev. Stat. § 646.636. The unlawful acts and omissions pled herein were, are, and continue to be part of a pattern or generalized course of conduct. Defendant's conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiff R.S. seeks an order enjoining Defendant from committing such unlawful practices pursuant to Or. Rev. Stat. § 646.638(8)(c); Or. Rev. Stat. § 646.636. The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiff R.S., the Oregon Class members and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiff R.S., the Oregon Class members and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Plaintiff R.S. is informed and believes and thereon alleges that Defendant's unlawful behavior is ongoing as of the date of the filing of this Complaint. If not enjoined by order of this Court, Defendant will or may continue to injure Plaintiff R.S. and Oregon consumers through the misconduct alleged herein. Absent the entry of a permanent injunction, Defendant's unlawful behavior will not cease and, in the unlikely event that it voluntarily ceases, it is capable of repetition and is likely to reoccur.

122.   This action was brought "within one year after the discovery of the unlawful method, act or practice." Or. Rev. Stat. § 646.638(6). By Defendant's design, its misrepresentations and omissions regarding the effects of the ingredients in its kratom Products made it virtually impossible for the typical consumer to discover the truth.

Plaintiff R.S. and members of the proposed Oregon Class were reasonable consumers who trusted Defendant's representations when they purchased Defendant's kratom Products.

### FIFTH CAUSE OF ACTION
**Breach of Implied Warranty**
*(On behalf of Plaintiffs and the Nationwide Class)*

123.    Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

124.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class against Defendant.

125.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that kratom is not addictive and does not cause opioid-like withdrawal symptoms because it did not provide disclosure on the Products' packaging stating otherwise.

126.    Defendant breached its warranty implied in the contract for the sale of its kratom Products because the Products could not pass without objection in the trade under the contract description: the kratom Products were not adequately contained, packaged, and labeled as per Defendant's contract with Plaintiffs and the Nationwide Class members, and the Products do not conform to the implied affirmations of fact made on the marketing and packaging for the Products that the Products are not addictive and do not cause withdrawals. U.C.C. §§ 2-313(2)(a), (e), (f). As a result, Plaintiffs and the members of the Nationwide Class did not receive the goods as impliedly warranted by Defendant to be merchantable.

127.    Plaintiffs and the Nationwide Class members purchased the K-Chill and Kryptic Kratom Products in reliance upon Defendant's skill and judgement and the implied warranties of fitness for the purpose.

128.    The K-Chill and Kryptic Kratom Products were defective when they left Defendant's exclusive control.

129.    Plaintiffs and the Nationwide Class did not receive the goods as warranted.

130.    As a direct and proximate cause of Defendant's breach of its implied warranty, Plaintiffs and the Nationwide Class have been injured and harmed because (i) they would not have purchased Defendant's Products on the same terms if they knew that the Products were addictive and could cause opioid-like withdrawal symptoms; and (ii) the Products do not have the characteristics, uses, or benefits as promised by Defendant.

131.    On November 4, 2024, Plaintiffs sent Defendant via certified mail a pre-suit notice letter that complied in all respects with U.C.C. §§ 2-314 and 2-607. Plaintiffs' counsel sent Defendant a letter advising Defendant that it breached an implied warranty and demanded Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

**SIXTH CAUSE OF ACTION**
**Unjust Enrichment**
***(On behalf of Plaintiffs and the Nationwide Class)***

132.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as fully stated herein.

133.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class members against Defendant.

134.    Plaintiffs and the Nationwide Class conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money they paid to Defendant.

135.    Defendants had an appreciation or knowledge of the benefit conferred on it by Plaintiffs and the Nationwide Class members.

136.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and the Nationwide Class members' purchases of the Products, and retention of such revenues under these circumstances is unjust and inequitable because Defendant failed to disclose on the Products' packaging that the Products were addictive and similar to opioids. This caused injuries to Plaintiffs and the Nationwide Class because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

137.   Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiffs and the Nationwide Class members.

138.   Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

139.   Plaintiffs and the Nationwide Class members are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

140.   As a direct and proximate result of Defendant's actions, Plaintiffs and the Nationwide Class members have suffered in an amount to be proven at trial.

141.   Here, equitable relief is appropriate because Plaintiffs may lack an adequate remedy at law if, for instance, damages resulting from their purchase of the Products is determined to be an amount less than the premium price of the Products, Plaintiffs would be left without the parity in purchasing power to which they are entitled.

142.   Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price will ensure that Plaintiffs are in the same place they would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at their disposal.

## SEVENTH CAUSE OF ACTION
### Fraud by Omission
*(On behalf of Plaintiffs and the Nationwide Class)*

143.   Plaintiffs reallege and reincorporate by reference all paragraphs alleged above.

144.   Plaintiffs bring this claim individually and on behalf of the Nationwide Class against Defendant.

145.   Defendant distributed its Products throughout the United States, including within the states of California and Oregon.

146.   Defendant misrepresented that its K-Chill and Kryptic Kratom Products had attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

147.   Defendant knows that kratom is addictive because it interacts with kratom vendors and has been made aware of user reports and kratom studies.

148.   Defendant knows that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers because addiction is an unreasonable health hazard.

149.   Defendant therefore had a duty to Plaintiffs and to the Nationwide Class members to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

150.   Consumers reasonably and justifiably relied on Defendant's omissions, because it is reasonable to assume that a Product which is addictive like an opioid would bear a warning on its packaging.

151.   As a result of Defendant's omissions, Plaintiffs and the Nationwide Class paid for K-Chill and Kryptic Kratom Products they may not have purchased, or paid more for those Products than they would have, had they known the truth about kratom.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves, and on behalf of the Classes, respectfully request this Court award relief against Defendant as follows:

a.   an order certifying the Classes and designating Plaintiffs as the Class Representatives and their counsel as Class Counsel;

b.   for an order that the discovery rule, pursuant to, without limitation, Or. Rev. Stat. § 646.638(6), applies and that the applicable limitations period—and the corresponding Class Period for the Oregon Class—extends back to the very first date that Defendant began engaging in the unlawful conduct alleged herein;

c.     for an order declaring Defendant's conduct violates the statutes referenced herein and finding in favor of Plaintiffs and the Classes on all counts asserted herein;

d.     award Plaintiffs and members of the Classes actual, consequential, punitive, and statutory damages, as appropriate;

e.     for prejudgment interest on all amounts awarded;

f.     award restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the members of the Classes as a result of Defendant's unlawful, unfair, and fraudulent business practices described herein;

g.     award declaratory and injunctive relief as permitted by law or equity, including enjoining Defendant from continuing its unlawful practices set forth herein, and directing Defendant to identify, with Court supervision, victims of its misconduct and pay them all money it is required to pay;

h.     order Defendant to engage in a corrective advertising campaign;

i.     award attorneys' fees and costs; and

j.     award any other further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.


Dated: November 4, 2024          **LYNCH CARPENTER, LLP**

By:  */s/Todd D. Carpenter*
Todd D. Carpenter (SBN 234464)
todd@lcllp.com
Scott G. Braden (SBN 305051)
scott@lcllp.com
1234 Camino del Mar
Del Mar, CA 92014
Tel:   619-762-1910
Fax:   858-313-1850

*Attorneys for Plaintiffs and*
*Proposed Class Counsel*